UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

PERFORMANCE CONTRACTORS, INC.

VERSUS

GREAT PLAINS STAINLESS, INC.

CIVIL ACTION

NO. 11-485-JJB

**RULING ON DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PLAINTIFF EXPERT EVIDENCE (*DAUBERT* MOTION) AND MOTION TO STRIKE AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion in Limine to Exclude Plaintiff Expert Evidence (*Daubert* Motion) and Motion to Strike (Doc. 69), and a Motion for Summary Judgment (Doc. 70) by the Defendant, Great Plains Stainless, Inc. Great Plains filed a Supplemental Memorandum (Doc. 84) in support of its Motion in Limine and Motion to Strike, the Plaintiff, Performance Contractors Inc., filed an Opposition (Doc. 86), and Great Plains filed a Reply (Doc. 92). Performance filed an Opposition (Doc. 87) to the Motion for Summary Judgment, and Great Plains filed a Reply (Doc. 93). Jurisdiction is based upon Title 28 of the United States Code, Section 1332. The Court held oral argument on the Motions other than the Motion for Summary Judgment on May 13, 2013. Great Plains subsequently filed a post-hearing memorandum (Doc. 110) in support of its Motion to Exclude and Motion to Strike, Performance filed a post-hearing memorandum in opposition (Doc. 112), and Great Plains filed a reply (Doc. 116).

I.  Background

This suit arises out of the construction of the Plaquemine VCM Plant ("the Project") in Iberville Parish, Louisiana. Performance Contractors, Inc. entered into a contract with Shintech Louisiana LLC calling for Performance to provide pipe fabrication

1

and installation services for the Project.  Performance claims it issued Purchase Order No. 45140011 to Louisiana Chemical Pipe Valve and Fitting, Inc. for duplex stainless steel piping and fittings for the Project.  Louisiana Chemical ordered the piping and fittings from Great Plains.  The ASTM A815/A815M-09a ("A815") standard applied to the fittings.  A815, among other things, requires heat treatment (annealing) and water quenching of 2205 duplex stainless steel.  ASTM A815/A815M-09a, at 6.1 & table 2.  A815 requires conformity with the ASTM A960/960M ("A960") standard.  ASTM A815/A815M-09a, at 2.1.  A815 does not impose a limit on intermetallic phases or ferrite content.

Performance claims the fittings supplied by Great Plains were defective.  This claim at least partly arises from the finding of a cracked two inch tee fitting during hydrostatic testing.  The cracked tee and other fittings were submitted to Welding Testing Laboratories ("WTL") for analysis.  WTL found a low ferrite content in the tee and concluded the fitting may have been improperly annealed.  Performance filed this lawsuit asserting claims for redhibition and products liability and seeking damages. Performance subsequently filed a Supplemental and Amended Complaint (Doc. 29) asserting claims as the assignee of Louisiana Chemical's rights against Great Plains for redhibition, products liability, breach of contract, and bad faith and misrepresentation. Performance has since filed a Second Supplemental and Amending Complaint (Doc. 111) to state a bad faith redhibition claim against Great Plains as a seller.  All claims in this lawsuit arise under Louisiana law.  In the instant Motions, Great Plains seeks to exclude at trial the evidence of the Plaintiff's experts, Gary Carinci, Ph.D., and Brian Soucy, P.E., strike their expert reports, and have summary judgment granted in its favor

because Performance cannot prove the products in question are defective under the ASTM standards.

## II. Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), "the Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). "The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Id*; *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) ("[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the

3

scientific method, and, therefore, are reliable."). Courts consider the following non-exclusive list of factors when conducting the reliability inquiry:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459.

### III. Gary Carinci

Great Plains asserts the following in support of its argument to exclude Gary Carinci's expert evidence and to strike his expert report. The duplex stainless steel parts at issue were ordered to meet A815. This standard was included in the material specifications in the Shintech contract with Performance Contractors, in Performance's purchase order to its supplier, and in the supplier's purchase order to Great Plains. Performance has admitted A815 applied. A815 includes specific requirements for the material's chemical composition, hardness, dimensions, and mechanical properties. It does not specify a ferrite level or level of intermetallic phases. The testing performed by Carinci—ASTM A923 Method A testing, ASTM A923 Method C testing, ASTM E562-11 testing, and Rockwell C hardness testing— and included in his report, is irrelevant to the facts at issue, because it does not show the materials supplied by Great Plains fail to meet A815. The Brinell hardness test Carinci performed was not in compliance with the applicable test standard, and cannot be used to determine the part's conformity with A815. The more stringent NACE standard referenced by Carinci has no application in this matter because the material order did not specify this standard. Therefore, Carinci's reliance on the NACE standard is incorrect and the testing and other evidence related to

the NACE standard is irrelevant and should be excluded.  Carinci's statement that the presence of intermetallic phases or low ferrite levels is indicative of improper heat treatment by the manufacturer is not based on sound scientific theory or methodology, and should be excluded as unreliable under Rule 702.

## A.  Standards and Tests

### 1.  NACE

Great Plains argues the NACE standard and NACE test results are irrelevant, since the material order did not specify this standard.  Performance responds that the Mill Test Certificates ("MTRs") accompanying the products in question provided the fittings were in accordance with NACE MR-0175.  Performance argues NACE MR0175/2009 provides duplex stainless steels shall have a ferrite content within a certain range, and Jndia and Great Plains both represented the products would have a ferrite content within this range, so the testing is relevant.  Carinci presented an equation at the hearing to calculate the expected ferrite level in the fittings.  R. Sanchez, I. Moreno, J. Almagro, J. Botella & X. Llovet, *Effects of composition and thermal history on the phase balance and elements distribution of standard and modified duplex stainless*, in 4TH STAINLESS STEEL SCIENCE AND MARKET CONGRESS: PROCEEDINGS (2002).  Performance argues Carinci conducted a multi-variable regression analysis using the equation by inserting the annealing temperature and chemical composition as certified by the manufacturer, resulting in an expected 46.75% ferrite content.  Performance avers this equation shows the annealing temperature was incorrect or the water quench was not followed, failing to accord with the manufacturing process mandated by A815.

Since the material order did not specify the NACE standard, Performance and Carinci cannot present the NACE standard or test results to show NACE compliance was required or unsatisfied, or testify to such a conclusion. Compliance with NACE cannot be applied to the facts at issue, so it is irrelevant per Rule 702. However, to the extent Carinci's NACE test results show a ferrite content that, using the presented equation and multi-variable regression analysis, shows non-compliance with the annealing and water quench requirements of A815, these results will be allowed. The results can properly be applied to the facts, and the equation and procedure have been tested and published. *Id.* The equation and procedure are therefore grounded in the methods and procedures of science and the consequent results are certainly more than unsupported speculation or subjective belief. Any questions by Great Plains regarding the equation can be handled through cross-examination.

2. ASTM A923 Method A Tests

Great Plains argues Carinci's ASTM A923 Method A tests for the presence of intermetallic phases have no bearing on whether a part is in compliance with A815, since A815 does not impose a limit on intermetallic phases. It argues for the test to be relevant, Shintech and Performance would have had to specify a limit by placing a supplemental requirement in the purchase order, which did not occur.

Performance argues the results of the tests are indicative of whether the fittings were heat treated or quenched in compliance with A815. It expands on this argument by asserting the following. The fittings were required to meet additional standards by Shintech's specifications. Even if the tests were not explicitly required by the purchase order, the Plaintiff's expert is not excluded from performing industry-accepted tests and
6

examining the results to support conclusions that the parts were defective and the A815 standard was not achieved. ASTM A923 ("A923") states "[c]orrect heat treatment of duplex stainless can eliminate these detrimental [intermetallic] phases," and the Method A test tests for intermetallic phase precipitation, the results of which are indicative of whether fittings were heat treated in compliance with A815. Performance presents a number of articles in support of its arguments, some of which were presented for the first time in its post-hearing memorandum.

    Since Performance presents no evidence that Great Plains was provided with Shintech's specifications or that A923 compliance was required, Performance and Carinci cannot present the ASTM A923 Method A test results to show A923 compliance was required or unsatisfied or testify to such a conclusion. Compliance with A923 cannot be applied to the facts at issue, so it is irrelevant per Rule 702. However, Carinci's Method A test results can be properly applied to the facts at issue to the extent they make it more probable the fittings were not annealed or quenched as required by A815. The parties agree improperly annealed parts will likely result in higher levels of intermetallic phases and lower levels of ferrite. Multiple scientific articles presented by Performance support the conclusion that high levels of intermetallic phases and low levels of ferrite occur when pieces are annealed or quenched at the wrong temperature or for the wrong amount of time, but do not occur when annealed or quenched at the correct temperature for the correct amount of time.[1] S. Topolska & J. Labanowski, *Effect of microstructure on impact toughness of duplex and superduplex stainless*

---

[1] This is true even if the articles presented in Performance's post-hearing memorandum are not considered. Also, while Great Plains is correct that some of the articles presented by Performance conducted tests involving aging, these articles contribute to the test results' relevancy since they address what happens when cooling occurs too slowly.

7

*steels*, J. OF ACHIEVEMENTS IN MATERIALS AND MFG. ENG'G, Oct. 2009, at 143–44; INT'L MOLYBDENUM ASS'N, PRACTICAL GUIDELINES FOR THE FABRICATION OF DUPLEX STAINLESS STEEL 10 (2009); L. Duprez, B.C. De Cooman & N. Akdut, *Microstructural Changes in Duplex Stainless Steel during Isothermal Annealing*, in 6TH WORLD DUPLEX CONFERENCE & EXPO: PROCEEDINGS 355, 357 (Associazione Italiana di Metallurgia ed., 2000); F. Elshawesh, N. Elahresh & A. Elhoud, *Effect of sigma phase on the pitting corrosion of 22/5 duplex stainless steel*, in DUPLEX STAINLESS STEELS: 5TH WORLD CONFERENCE: BOOK 2: CORROSION, SERVICE & APPLICATION, & METALLURGY 658 (Stainless Steel World ed., 1997). As A815 requires heat treatment, Carinci's ASTM A923 Method A tests and results will be allowed. ASTM A815/A815M-09a, at 6.1 & table 2.

### 3. ASTM A923 Method C Tests

Great Plains argues the A923 Method C test, which measures corrosion of a stainless steel part, is irrelevant, since the A815 standard does not impose a corrosion rate. Therefore, it argues this test and its results are irrelevant to the facts of this case. Performance makes the same arguments regarding this test and results as it does for the ASTM A923 Method A tests. Performance fails to explain how testing the corrosion of the fittings or information about the corrosion rate of a fitting is related to compliance with A815, so the results of these tests and any related conclusions are excluded as irrelevant under Rule 702 since they cannot be properly applied to the facts at issue.

### 4. ASTM E562-11 Tests

Great Plains argues the ASTM standard E562-11 ("E562") tests, used to determine the percentage of ferrite and intermetallic phases in a stainless steel part, are irrelevant, since A815 does not require or establish a level or limit on ferrite or

8

intermetallic phases and no supplemental requirements for ferrite control or level of intermetallic phases were included in the purchase order. Performance argues this test allowed Carinci to determine the defect was "a direct result of improper heat treatment and/or quenching," which is directly addressed in A815. Performance argues the test is also relevant to whether Great Plains misrepresented the qualities of the products, as those representations included a stated percentage of ferrite. For the reasons stated in section III(A)(2) addressing A923 Method A test results, the E562 tests and results will not be excluded. They can be properly applied to the facts at issue to the extent they make it more probable the fittings were not annealed or quenched as required by A815.

5. Hardness Testing

a. Rockwell C

Great Plains argues the results of Carinci's Rockwell C hardness test are irrelevant, since the test is not required by A815. Rather, it asserts the Brinell hardness scale is specified by A815. Performance responds with the following. The ASTM A960 and A315 standards are specifically referenced by A815, and specify that Brinell testing is not appropriate for pieces with thicknesses less than .2 inches, such as the instant fittings, and that Rockwell testing is expressly required. The MTRs used the Rockwell standard, so Great Plains represented the fittings had a specific measurement on the Rockwell test thereby making the test relevant. Rockwell C results can be converted to Brinell hardness. Carinci also evaluated the fittings using Brinell hardness testing, which showed all fittings tested were in nonconformance with the standard specified in the Performance purchase orders. Great Plains argues in reply, citing ASTM standard E10-08 ("E10"), that the Rockwell test results cannot be converted to the Brinell scale,

9

and Carinci's Brinell testing did not comply with the applicable standard, used the wrong scale, and provided results that cannot be used to determine conformity with A815, so it is unreliable and irrelevant.

Performance is correct that Carinci's Rockwell C hardness test results are relevant and reliable. The results are relevant because ASTM standard A370-11 ("A370"), the standard describing which hardness test is appropriate for a specimen, provides that Brinell testing is not applicable to tubular pieces with wall thicknesses less than .2 inches, and that the Rockwell test is to be used on such pieces.[2] ASTM A370-11, at 98, 116. Accordingly, to the extent the tested fittings have walls thin enough to require Rockwell C testing, Carinci's Rockwell C test results can properly be applied to the facts of the case and will not be excluded. Great Plains does not assert any specific or meaningful arguments as to why the Rockwell C test, if relevant, is unreliable. Considering that the test is described in A370, and has been tested and accepted by the community, the Rockwell C test is reliable and grounded in scientific method and procedure.

    b. Conversion from Rockwell C Hardness Scale to Brinell Hardness Scale

Whether Rockwell C test result numbers can be converted to Brinell scale numbers is a confusing issue due to the presence of somewhat incongruous ASTM standards. On the one hand, A370 provides a conversion table of "Approximate Hardness Conversion Numbers for Nonaustenitic Steels" to convert Rockwell C numbers to other hardness numbers, including Brinell numbers. ASTM A370-11, at Table 2. On the other hand, E10 states "there is no general method of accurately converting" Brinell hardness numbers to other types of hardness numbers, and states

---

[2] A815 and A960 both reference A370.

such conversions are approximations that are generally to be avoided "except for special cases where a reliable basis for approximate conversion has been obtained by comparison tests." ASTM E10-08, at 8.1. However, a footnote to the A370 conversion table states caution should be exercised if conversions from this table are used for the acceptance or rejection of a product, and the approximate interrelationships of hardness values and approximate tensile strength, which may vary, may affect acceptance or rejection. ASTM A370-11, at Table 2, n. A.

The aforementioned standards and cautionary statement, along with the fact that Performance presents no comparison tests demonstrating a reliable basis for approximate conversion, show the conversion table numbers are not reliable for use by Performance in this case. Furthermore, Performance fails to satisfy any of the non-exclusive reliability factors for the conversion procedure. *Johnson*, 685 F.3d at 459. Carinci's Brinell numbers converted from his Rockwell C test results consequently cannot be used to determine whether the fittings conformed to A815, and the conversion and resulting Brinell numbers are excluded from trial as unreliable under Rule 702.

c. Brinell

Great Plains does not challenge the Brinell test itself as unreliable, and since the test is stated in the ASTM standards, and has been tested and accepted by the community, the test is grounded in the methods and procedures of science. However, Great Plains argues Carinci's Brinell test was not performed in compliance with the applicable test standard, used the wrong scale, and cannot be used to determine the part's conformity with A815, but does not say why. Specifically, Great Plains and its

11

expert, Claude Mount, Ph.D., P.E., assert: (1) Carinci applied the wrong force of 1500 kilograms instead of 3000 kilograms; (2) he used the wrong force ratio; and (3) he reported the maximum hardness values instead of the average values as required by E10. Great Plains argues these non-compliant tests invalidate Carinci's test results and resulting conclusions.

Performance and Carinci respond that Carinci used 1500 kilograms because the pieces are too small to conduct the test in conformance with the standard, since 3000 kilograms of force on a 10mm ball goes all the way through the piece being tested, and instead tests the hardness of the anvil on which the piece sits, leading to inaccurate test results. Performance also claims Carinci reported all tested values.

Performance fails to demonstrate Carinci reliably applied the Brinell test, since it provides no authority showing use of 1500 kilograms of force on small pieces is grounded in the methods and procedures of science. Performance does not present the Court with anything to show this amount of force is the proper alternative to 3000 kilograms, or that use of this force in a situation like the one at hand satisfies any of the non-exclusive reliability factors. Carinci's Brinell hardness test results will therefore be excluded from trial as unreliable under Rule 702.

> B. Reliability of Statement that the Presence of Intermetallic Phases and/or Low Ferrite Levels is Indicative of Improper Heat Treatment by the Manufacturer

Great Plains concedes that generally speaking, improperly annealed parts will likely result in higher levels of intermetallic phases and lower levels of ferrite. Great Plains argues, however, the conclusion that low ferrite and higher intermetallic phases must be caused by improper annealing is not true. Great Plains argues the following in support of its argument. Carinci admits improper heat treatment is but one possible

12

cause for the formation of intermetallic phases, and WTL admitted in its report the conclusion of improper annealing is speculation. This speculation or suggestion of a link between the data and the proffered theory is not sufficient to withstand a *Daubert* challenge, according to *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 195 (5th Cir. 1996). Carinci refers to and misapplies studies of parts subjected to heating at temperatures less than the solution annealing temperature for duplex stainless steel, called aging heat treatments, and in ranges specifically meant to cause intermetallic phases to develop. Citing Mount, Great Plains argues the studies' results, showing decreased percentage of ferrite and increased percentage of intermetallic phases, are to be expected and do not prove or tend to show that low ferrite levels and/or the presence of intermetallic phases are caused singularly by improper annealing. Finally, Great Plains argues, citing the January 24, 2011 WTL report, Performance's experts believed and assumed a single manufacturer was involved in the testing and replacement of the parts, when Great Plains supplied duplex stainless steel fittings from at least thirteen different manufactures and different countries of origin. The likelihood that multiple manufacturers improperly heated the fittings is remote. In support of its argument, Great Plains cites Carinci's deposition testimony that if there were fifteen manufacturers, it is not highly probable that all of the manufacturers used improper annealing procedures, and that the results could be caused by the annealing or the test and technique.

Performance responds with the following. Carinci's conclusions are supported by references submitted to Great Plains, and are based on sound scientific principles. *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010), holds where evidence of

13

correlation is itself potentially relevant and unlikely to mislead the jury, an expert who reliably discerns this relationship can present such conclusions to the jury. Performance presents Carinci's deposition testimony that he submitted support for his conclusion that intermetallic phases would not be seen in material if heat treated properly. It also presents language from *Bonnette v. Ford Motor Co.*, 2011-1274 (La. App. 3 Cir. 3/7/12), 88 So. 3d 1164, 1168, that the buyer in a redhibition action is not required to negate all other causes of a defect, but can use circumstantial evidence giving rise to a reasonable inference. It also presented a number of scientific articles at the hearing and in its post-hearing memorandum.

Great Plains responds Carinci provided no industry publications to support his opinions that (1) improper annealing can be concluded from the presence of intermetallic phases, and (2) the presence of intermetallic phases in an amount greater than zero is indicative of a defect. It presents *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999), in support of its argument that without critical scientific predicates, no scientifically reliable conclusion can be drawn. Great Plains further argues Carinci admits testing for intermetallic phases is only relevant where established acceptance criteria exists, and Carinci used the NACE standard, while the A815 standard, which applies, sets no limits on intermetallic phases. Great Plains argues in its post-hearing memoranda that Carinci does not provide any scientific articles that actually support his conclusion, and all of the publications submitted at the hearing address the formation of intermetallic phases when duplex stainless steel is subjected to aging treatment. It further argues that the articles attached to Performance's post-hearing memorandum are impermissibly tardy, but regardless, they do not support Carinci's conclusion.

The scientific articles submitted by Performance and Carinci and addressed above create the scientific predicates necessary to make a scientifically reliable conclusion. S. Topolska & J. Labanowski, *supra* section (III)(A)(2), at 143–44; INT'L MOLYBDENUM ASS'N, *supra* section (III)(A)(2), at 10; L. Duprez, B.C. De Cooman & N. Akdut, *supra* section (III)(A)(2), at 355, 357*;* F. Elshawesh, N. Elahresh & A. Elhoud, *supra* section (III)(A)(2), at 658; *see Black*, 171 F.3d at 313 (holding scientific predicates are necessary to make a scientifically reliable conclusion). "[W]here evidence of correlation itself is potentially relevant and unlikely to mislead the jury, an expert who reliably discerns this relationship can present such conclusions to the jury . . . ." *Valencia*, 600 F.3d at 425. That is the situation here. Test results showing higher levels of intermetallic phases and low levels of ferrite, combined with articles stating high levels of intermetallic phases and low levels of ferrite occur when pieces are annealed or quenched at the wrong temperature or for the wrong amount of time, but do not occur when annealed or quenched at the correct temperature for the correct amount of time, makes improper annealing a conclusion that is not misleading to a jury or based on speculation or subjective belief. To the extent Carinci's test results show higher levels of intermetallic phases or low levels of ferrite, his conclusion of improper annealing is grounded in the methods and procedures of science, including testing, publication, and review by members of the scientific community, is reliable, and will not be excluded.

Great Plains' concern with Carinci's conclusions about what percentage of intermetallic phases is too great and what percentage of ferrite is too small can be

handled on cross-examination and by reference to the articles Carinci uses in support of his conclusions.

IV. Brian Soucy

Great Plains argues the opinion of Brian Soucy, P.E., is irrelevant, because he based his opinion that Performance's testing was reasonable on the erroneous conclusion that the parts may have been improperly annealed. Performance asserts Soucy's opinions are based on, among other things, Carinci's valid expert opinion, and WTL's report concluding the fittings were defective as a result of improper annealing. Soucy did not testify at the hearing. Considering that the conclusion that the parts may have been improperly annealed will be allowed at trial, Soucy's testimony based on this conclusion will not be excluded as unreasonable or erroneous.

Performance argues Soucy's report takes into consideration several other factors in reaching his conclusion that Performance's actions were reasonable. These factors include general chemistry background, return on capital investment, public perception and involvement, trade association requirements, and applicable regulatory standards. Great Plains argues Performance and Soucy's report and testimony fail to explain the relevance of these factors to Great Plains' liability, and the report and testimony based on the report do not assist the trier of fact to determine the facts at issue in this litigation. Since each of these factors is something a company might consider in making a business decision, the factors are relevant and can properly be applied to the facts.

V. Federal Rule of Evidence 403

Great Plains argues Carinci's and Soucy's testimony is confusing, misleading and the probative value of the evidence is substantially outweighed by the danger of

16

Case 3:11-cv-00485-JJB-SCR   Document 121   07/12/13   Page 16 of 18

unfair prejudice under Federal Rule of Evidence 403. The Court disagrees. No danger of unfair prejudice could arise from the presentation of the relevant and reliable expert testimony allowed at trial by this opinion.

VI. Summary Judgment

Great Plains avers Performance's claims hinge on this Court's finding that the products supplied by Great Plains were defective per the ASTM A815 standard, which Performance cannot prove since its experts solely rely on irrelevant and unreliable expert testimony that should be stricken from the record.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment carries the burden of demonstrating there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the Court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes*
17

*v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139–40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991). If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex*, 477 U.S. at 322.

Since A815 requires heat treatment and quenching in conformance with the standard, and Performance's experts' conclusions that the parts in question were not properly heat treated or quenched are allowed at trial as stated in this opinion, a reasonable juror could find the products supplied by Great Plains were defective under the A815 standard. Summary judgment is therefore inappropriate.

VII. Conclusion

Accordingly, Great Plains Stainless, Inc.'s Motion in Limine to Exclude Plaintiff Expert Evidence (*Daubert* Motion) and Motion to Strike (Doc. 69) are **GRANTED IN PART** and **DENIED IN PART** as provided herein. Great Plains Stainless, Inc.'s Motion for Summary Judgment (Doc. 70) is **DENIED**.

**IT IS HEREBY ORDERED** that the evidence and testimony of Performance's experts excluded herein is stricken from the experts' reports.

Signed in Baton Rouge, Louisiana, on July 11, 2013.

_____
**JAMES J. BRADY, DISTRICT JUDGE**